IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL NO. 5:10CV155-RLV
(5:03CR04-RLV-DSC-9)

| | |
|---|---|
| JOSE LUIS AGUILAR-RIVERA, )<br>)<br>Petitioner, )<br>)<br>vs. )<br>)<br>UNITED STATES OF AMERICA, )<br>)<br>Respondent. )<br>_____) | **O R D E R** |

**THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255, (Doc. No. 1), on the Government's Motion for Summary Judgment, (Doc. No. 14), and on Petitioner's Motion Requesting Default Judgment against the United States, (Doc. No. 12).

**I.     BACKGROUND**

1. Procedural History

Petitioner Jose Luis Aguilar-Rivera was one of eighteen defendants initially indicted on January 29, 2003, in a large cocaine trafficking conspiracy. See (Case No. 5:03-cr-4-RLV-DSC-9, Doc. 23: Indictment). There were several superseding indictments as various co-defendants pled guilty, and as new charges were brought, culminating with a fourth superseding indictment, returned on June 29, 2004, against Petitioner, Roderick Williams, Mario Arrellano-Carbajal, Phillip Morrison, and Leobardo Martinez. See (Id., Doc. No. 340: Fourth Superseding Indictment). Petitioner, who had returned to his native Mexico before the original indictment was returned, was not apprehended until he was arrested in Louisiana in 2007. See (Id., Doc.

1

No. 778 at 1; 13: Presentence Investigation Report). In the meantime, co-defendants Williams, Morrison, and Martinez went to trial in July 2004 and were convicted by a jury on all of the counts in which they were named. Co-defendant Arrellano-Carbajal apparently fled and his case is still pending. See (Id., Doc. No. 779 at 3).

On June 20, 2008, Petitioner pled guilty pursuant to a written agreement to conspiring to possess with intent to distribute 5 or more kilograms of cocaine and 50 or more grams of cocaine base, in violation of 21 U.S.C. § 846. See (Id., Doc. No. 759: Plea Agreement; Doc. No. 853: Transcript of Plea and Rule 11 Hearing). The parties stipulated that 5 to 15 kilograms of cocaine powder was known to Petitioner or reasonably foreseeable by him. See (Id., Doc. No. 853 at 9). The parties also agreed that there was an issue as to whether Petitioner should receive a two-level enhancement for possessing a firearm during the course of the drug offense to which he was pleading guilty, and that this issue would be determined at the sentencing hearing. (Id.).

The probation officer subsequently recommended in Petitioner's Presentence Investigation Report ("PSR") that the firearm enhancement be applied. See (Id., Doc. No. 778 at 12). Petitioner, through his attorney James Quander, objected to this enhancement and also argued that he should be eligible for the safety-valve reduction of U.S.S.G. § 5C1.2, which would not only have reduced his offense level but would have allowed the Court to sentence him below the otherwise applicable 10-year mandatory minimum. See (Id., Doc. No. 788: Sentencing Memorandum). At the sentencing hearing on December 8, 2008, the Government presented testimony by Lieutenant David Ramsey of the Iredell County Sheriff's Office regarding Petitioner's possession of a firearm during the course of the cocaine conspiracy. See (Id., Doc. 809 at 10-26: Transcript of Sentencing). At the conclusion of that testimony and the arguments of counsel, the Court found by a preponderance of the evidence that Petitioner did possess a 9-

mm pistol during an incident on July 25, 2002, and the Court overruled the objection to the two-level firearm enhancement. (Id. at 29). The finding concerning the firearm blocked application of the safety valve reduction. Petitioner therefore had a sentencing range of 120 to 135 months, with a ten-year mandatory minimum, and the Court imposed a sentence of 127 months. (Id. at 29; 36).

Petitioner appealed, notwithstanding the appellate waiver contained in his plea agreement, and in an unpublished decision on August 17, 2010, the Fourth Circuit affirmed the sentence. United States v. Aguilar-Rivera, 391 Fed. App'x 282 (4th Cir. 2010). Petitioner placed the instant motion to vacate in the prison mail system on October 11, 2010, and it was stamp-filed in this Court on October 19, 2010. Petitioner asserts in the motion to vacate that counsel Quander rendered ineffective assistance at the sentencing hearing by not having a subpoena issued so that Petitioner could have put co-conspirator Andy Garcia on the stand, and by not having Petitioner testify.[1] See (Doc. No. 1).

2. The Evidence Regarding the Firearm Enhancement

At the sentencing hearing, Lieutenant Ramsey essentially summarized the testimony from the 2004 Williams/Morrison/Martinez trial conducted by this Court regarding the evidence as to the July 25, 2002, incident in which Petitioner carried and used a firearm. Lieutenant Ramsey testified that the Statesville Police Department responded that day to reports of a shooting in the vicinity of 325 Salisbury Road and encountered Morrison, who had been shot in the buttocks. See (Case No. 5:03-cr-4-RLV-DSC-9, Doc. No. 809 at 10-11).

Officers recovered ten spent shell casings and two live rounds, all 9-mm ammunition, in the

---

[1] The co-conspirator's true name is Jorge Ortiz-Rojas, but he was apparently known to his co-conspirators and law enforcement in North Carolina as Andy Garcia.

driveway near the apartment where Garcia lived. (Id. at 12-13). They also recovered bags of cocaine in the area, a 10-mm handgun, and a driver's license in the name of Arrellano-Carbajal. (Id. at 13). Lieutenant Ramsey testified about his later interviews of Garcia, in which Garcia said that Morrison and Williams had planned to rob Petitioner (aka "Mole"), Arrellano-Carbajal ("Chinto"), and himself during what was supposed to be the sale of a kilogram of cocaine by the Hispanic men to Williams and Morrison. (Id. at 13-14). Lieutenant Ramsey then recounted Garcia's trial testimony. (Id. at 14). Garcia had previously brokered kilogram deals with Williams, but on July 25, 2002, Williams had essentially "gone around" Garcia and had arranged directly with Garcia's source, Chinto, to set up a deal that was to take place at Garcia's apartment at 325 Salisbury Road. (Id.). Williams and Morrison arrived at Garcia's residence. Chinto and Petitioner also arrived there, but without the cocaine. (Id.). Chinto then sent Petitioner to get the cocaine. Petitioner returned approximately 20 minutes later with the cocaine in a blue Food Lion plastic bag. (Id. at 14-15). At that point, Morrison pulled out a 10-mm pistol (the one later recovered nearby by law enforcement) and robbed Chinto, Garcia, and Petitioner of the money and the cocaine. (Id. at 15).

After Williams and Morrison left the apartment, Petitioner ran out to his nearby Ford Thunderbird, removed a 9-mm pistol, and fired approximately 12 or 13 rounds at the fleeing Morrison and Williams. (Id. at 16). Garcia saw Williams apparently getting hit in the upper body or shoulder area, and saw him drop some of the cocaine. (Id. at 17). Afterwards, Garcia was able to pick up about 12 ounces of the cocaine that had been supplied. (Id.). Garcia stored this cocaine, as well as the pistol that Petitioner had used, in an air-conditioning vent in his apartment. (Id.). Garcia drove Petitioner and Chinto to Harmony, North Carolina. When Garcia later returned he saw that a copy of an executed search warrant had been left in his apartment.

4

(Id.). Lieutenant Ramsey's trial testimony corroborated Garcia's testimony, including Morrison's being treated at the hospital for a gunshot wound, DNA analysis proving that Williams's blood was on a bag at the scene, and the live ammunition and shell casings found at the scene. (Id. at 18). On cross-examination, Lieutenant Ramsey testified that Garcia was in federal custody, and that he "believe[d] [Garcia] may [have been] in Butner" at the time of the hearing. (Id. at 21). The 9-mm pistol was never recovered. (Id.). Lieutenant Ramsey did not believe the spent shell casings were ever tested for fingerprints, nor did he know if the registered owner of the Thunderbird was ever determined. (Id. at 24).

According to Respondent, Garcia's testimony from his 2004 trial in this Court supports Lieutenant Ramsey's testimony at Petitioner's sentencing hearing. See (Doc. No. 13-1: Exhibit to Respondent's Summary Judgment Motion). In the 2004 trial, Garcia testified that he had arranged two previous kilogram sales of powder cocaine to Williams before the robbery. (Doc. No. 13-1 at 12). Garcia testified that on the afternoon of July 25, 2002, Williams and Morrison unexpectedly arrived at Garcia's back door, and Chinto and Petitioner unexpectedly arrived at his front door. Garcia learned that Williams had contacted Garcia's source, Chinto, directly to buy another kilogram. (Id. at 24-26). Once they were all in the apartment, Williams lifted his shirt to show a money belt with the cash for the sale, and Chinto sent Petitioner to get the cocaine. (Id. at 29). Petitioner returned, driving a blue Thunderbird that he parked in the rear, and carried a blue bag into the apartment with the cocaine. (Id. at 30-31; 53). Morrison then displayed a pistol and robbed Petitioner, Chinto, and Garcia of the money and the drugs. (Id. at 33-35). When Williams and Morrison left through the back door, Petitioner immediately went out behind them, reached through an open window of the Thunderbird, and retrieved a 9-mm pistol from the glove box. (Id. at 36-37; 62). Garcia was just behind Petitioner, who "pulled"

5

the pistol before firing, causing one of the rounds to come out. (Id. at 60; 62). Petitioner immediately began shooting at both Williams and Morrison, who ran off in separate directions. (Id. at 36-37). Garcia saw Williams take a hit in the upper body and get knocked down, causing him to drop the Food Lion bag holding the cocaine. (Id. at 37-38). Several of the individual packages of cocaine fell out, and Garcia retrieved some of it immediately after Williams had fled the scene. (Id. at 38).

On the way back into the apartment, Garcia ran past Petitioner, who had fired all of his ammunition, and whose pistol was in the cocked-back and empty position. (Id.). Garcia took the pistol from Petitioner and hid it as well as the cocaine Garcia had retrieved, and he stashed them in an air conditioning vent on the floor of his apartment. (Id. at 38; 40). Garcia then drove Petitioner and Chinto to Harmony for the rest of the afternoon. When Garcia came back that night he saw that a search warrant had been executed at his apartment, but the police had not discovered the hidden cocaine and pistol. (Id. at 40-41). Garcia testified that he had not seen Chinto or Petitioner since that day, and he believed they were both in Mexico. (Id. at 75). Garcia was arrested on August 5, 2002, when he responded to the Sheriff's Office under the belief that he was just going to be shown some photographs. (Id. at 41). With the exception of a couple of days of freedom in July 2003, when he was mistakenly released from jail, Garcia had been held since that day. (Id. at 46-48).

3. Petitioner's Sentencing

At the conclusion of Lieutenant Ramsey's direct testimony and counsel Quander's cross-examination of him at Petitioner's sentencing hearing, counsel Quander told the Court that Petitioner had no evidence to present. See (Case No. 5:03cr-4-RLV-DSC-9, Doc. No. 809 at 26). Nothing in the record indicates that Petitioner disagreed with this statement, or that he

asked for any type of consultation with counsel Quander at this point. Acknowledging that the Court could consider hearsay information at a sentencing hearing, counsel Quander nonetheless argued that Petitioner had a Sixth Amendment right that could not be satisfied by simply having Lieutenant Ramsey provide "this kind of testimony" regarding the gun enhancement's applicability, when it all came down to credibility and there was no way for him to cross-examine the source of the information. (Id.). Counsel Quander stated that Garcia was "possibly in Butner," and argued that there was no reason the Government could not have brought him back to testify for this hearing. (Id. at 27). Counsel Quander, therefore, argued that the Government had not presented enough evidence to prove, by a preponderance, that Petitioner had possessed a firearm. (Id. at 27-28). The Government responded that it had provided nine disks of discovery to the defense, and that the PSR had made clear that the gun enhancement was based on Garcia's testimony at the earlier trial. (Id. at 28). The Government also noted that this Court had had the opportunity to assess Garcia's credibility during his testimony. (Id.).

    The Court found by a preponderance of the evidence that Petitioner did possess a firearm during the incident in question, which was part of the drug conspiracy, and overruled the objection to the enhancement. (Id. at 29). Counsel Quander then spoke in detail about Petitioner, his family, and the offense, and asked the Court to sentence Petitioner at the bottom of the range, which was 120 months. (Id. at 29-33). The Court asked Petitioner if he would like to say anything to the Court, and Petitioner responded with an apology for his crimes, and an explanation that he committed them due to money problems and a need to take care of his family. (Id. at 33). He acknowledged his guilt for the drug offense, but disputed the applicability of the firearm enhancement, stating: "I know I'm being sentenced for what I did, but I don't want to accept the fact that I'm being charged with possession of a gun. If you had

7

that evidence, I wish somebody would come forward and present this evidence." (Id. at 33-34). After hearing from the prosecutor and further from counsel Quander, the Court sentenced Petitioner to 127 months, near the middle of the applicable guideline range. (Id. at 36).

4. Petitioner's Direct Appeal

In his direct appeal, Petitioner was also represented by counsel Quander, who filed an Anders brief questioning whether the Court erred by imposing the firearm enhancement. The Fourth Circuit affirmed, specifically rejecting Petitioner's argument that this Court erred by relying on "hearsay evidence from a single officer who recounted evidence and testimony from a co-conspirator's trial," observing that the law is well-established that a sentencing court may rely on hearsay evidence. United States v. Aguilar-Rivera, 391 Fed. App'x 282, 284 (4th Cir. 2010).

## II. STANDARD OF REVIEW

A. Section 2255

Pursuant to Rule 4(b) of the Rules Governing Section 2255 Proceedings, sentencing courts are directed to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings" in order to determine whether a petitioner is entitled to any relief. If a petitioner's motion survives initial review and once the Government files a Response, the Court must then review the materials submitted by the parties to determine whether an evidentiary hearing is warranted under Rule 8(a) of the Rules Governing Section 2255 Proceedings. After having considered the record in this matter, including the parties' summary judgment materials, the Court finds that this matter can be resolved without an evidentiary hearing. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

B. Summary Judgment

Summary judgment is appropriate in those cases where there is no genuine dispute as to any

material fact, and it appears that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c)(2); United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991). Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). Where, however, the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

### III. DISCUSSION

#### A. Ineffective Assistance of Counsel

In his two proposed grounds for relief, Petitioner contends that he received ineffective assistance of counsel based on counsel Quander's failure to have a subpoena issued so that Petitioner could have put co-conspirator Andy Garcia on the stand at Petitioner's sentencing hearing, and by not having Petitioner testify. The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions the accused has the right to the assistance of counsel for his defense. See U.S. CONST. amend. VI. To show ineffective assistance of counsel, Petitioner must first establish deficient performance by counsel and, second, that the deficient performance prejudiced Petitioner. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; see also United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010). Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)). Under these circumstances, the

9

petitioner "bears the burden of affirmatively proving prejudice." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

      a. Failure to Have Garcia Testify at Petitioner's Sentencing Hearing

In his motion to vacate, Petitioner essentially claims that Garcia, not Petitioner, possessed the 9-mm pistol and shot Williams and Morrison on July 25, 2002. Petitioner questions why Garcia, who was cooperating with the Government, did not turn over the pistol and the drugs for tests to determine fingerprints. (Doc. No. 1 at 15-17). In doing so, Petitioner ignores the evidence, already discussed, that Garcia did not begin cooperating with law enforcement until he had been arrested and held in custody. Indeed, nothing indicates that either the drugs or the pistol remained in Garcia's constructive or actual possession by the time he finally began cooperating. Petitioner also claims that the law enforcement authorities knew this, and that they deliberately covered this up in order to protect Garcia, because he was cooperating with them. (Id.). Petitioner contends that it is "unbelievable" that the Government did not test the shell casings found on the scene for fingerprints, or, he theorizes, "it might be that the tests were performed but only [Garcia's] fingerprints were found and it could not be used as it would have discredit[]ed their main and only witness." (Id. at 17-18).

Petitioner argues that there "was no reason for counsel's failure to anticipate lieutenant Ramsey's testimony and by the same token to have subpoenaed Garcia who was close by at FCI Butner,[] as everything hinged on Garcia's credibility."[2] (Id. at 18). In an affidavit in response

---

[2] Respondent notes that Petitioner states in his motion to vacate that Garcia was nearby at Butner, but Respondent asserts that the only evidence of this was Lieutenant Ramsey's testimony

to Petitioner's motion, counsel Quander states that the reason he did not subpoena Garcia to the sentencing hearing was because, in his opinion, "his presence would have only strengthened the government's claim that a 2-level enhancement should have been applied. Although I could have cross examined Garcia, I firmly believed that his credibility had previously been examined by Judge Voorhees during his testimony in other cases. I believed that [Garcia] not being present would have placed the Defendant in the best position to prevail." (Doc. No. 13-2 at ¶ 3: Quander Affidavit).

Petitioner fails to satisfy either prong of the Strickland test. Counsel Quander has provided a reasonable and credible explanation for his strategic decision not to have Garcia at the hearing, and that decision is entitled to deference. Even if the failure to have Garcia testify were in some way professionally deficient, Petitioner fails to satisfy the prejudice prong, which requires that he "must affirmatively show that there is a reasonable probability" that, if Garcia had testified the Court would not have found that the firearm enhancement was applicable. See Jones v. Murray, 947 F.2d 1106, 1115 (4th Cir. 1001).

Significantly, however, Petitioner never asserts that Garcia would have testified in any way contrary to his earlier trial testimony, which this Court witnessed. Petitioner never claims that Garcia would have contradicted his previous testimony, accept the responsibility himself, exonerate Petitioner and risk a perjury charge. Petitioner is essentially arguing that if Garcia had testified at the hearing, counsel Quander would have been able to accomplish what three other defense attorneys had failed to do—that is, impeach Garcia such that this Court would discredit his testimony. Petitioner simply fails to carry his burden of showing that Garcia's live testimony

---

that he believed that Garcia might be at Butner, but Garcia's actual whereabouts at the time of the hearing were never established.

at the sentencing hearing would have led to a different conclusion by this Court. In sum, Petitioner has failed to show ineffective assistance of counsel based on counsel Quander's failure to subpoena Garcia to testify at Petitioner's sentencing hearing.

      b. Failure to Have Petitioner Testify

Petitioner also argues that counsel Quander rendered ineffective assistance by failing to put him on the stand at the sentencing hearing. Petitioner asserts that if counsel Quander had done so, and "had [Petitioner] testified to the truth concerning the firearm, it would have rebutted the third party showing by the government and consequently, Andy Garcia would have had to be brought to court for confronting [Petitioner] and his attorney, even though the sloppy investigation does not show a connection between the firearm and the drug offense." (Doc. No. 1 at 16-17).

Notably, Petitioner does not allege that he actually wanted to testify and that he told counsel Quander to put him on the stand, <u>nor</u> does he allege that counsel Quander advised him not to testify, refused to put him on the stand, or affirmatively misinformed Petitioner hat he had no right to testify. Instead, Petitioner makes a bare assertion that his testimony would have caused the Government to put Garcia on the stand, and that Petitioner's testimony would have proven that he was entitled to the safety valve treatment. In other words, Petitioner's argument is, at best, a purely post-hoc complaint that if he had testified the Court may have credited Petitioner's, and discredited Garcia's, account of the incident.

In his affidavit, counsel Quander states that before the sentencing hearing he discussed with Petitioner the possibility of having Petitioner testify, and that he explained to Petitioner the objection to the firearm enhancement and the effects of a firearm possession on a possible safety valve benefit. <u>See</u> (Doc. No. 13-2 at ¶ 4). He also advised Petitioner that if the Court

12

disbelieved his testimony, he could lose the safety valve consideration even if the Court found the Government had failed to meet its burden of proof regarding the gun possession, and there was also the possibility that Petitioner could lose the reduction for acceptance of responsibility, suffer an enhancement for obstruction of justice, and even be charged with perjury. (Id.). As counsel Quander explains in his affidavit, "After a number of meetings with the Defendant, it was my belief that his credibility would have been an issue." (Id.). Counsel Quander therefore advised Petitioner that he had a right to testify but that this was not his recommendation. (Id.). At no point after the meeting in which he expressed this advice did Petitioner ever express any desire to testify. (Id.). Additionally, after the Government's presentation of evidence, counsel Quander did not think that any further evidence would strengthen the defense case. (Id.).

As with the argument over the failure to put Garcia on the stand, Petitioner's argument here, too, fails to satisfy either prong of the Strickland test. First, regarding deficient performance, counsel Quander's explanation is entirely reasonable and credible. Moreover, even if this Court were to read into Petitioner's motion a claim that Petitioner did not testify because counsel Quander advised him not to do so, it is well-settled that "the advice provided by a criminal defense lawyer on whether his client should testify is 'a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance.'" Carter v. Lee, 283 F.3d 240, 249 (4th Cir. 2002) (quoting Hutchins v. Garrison, 724 F.2d 1425, 1436 (4th Cir. 1983)). Finally, when Petitioner was given a chance to address the Court at his sentencing hearing, although he did deny possessing the pistol, he never said that he wanted to testify but that his will had been overborne by counsel Quander.

Next, even if Petitioner could somehow show that counsel Quander's performance was deficient, he fails to satisfy the prejudice prong. See Sexton v. French, 163 F.3d 874, 884 (4th

13

Cir. 1998) (defendant failed to establish prejudice from counsel's failure to advise him of his right to testify or to decline to testify, since the result of the proceeding was not fundamentally unfair or unreliable). That is, Petitioner fails to show how the lack of his uncorroborated and self-serving testimony prejudiced his defense. See United States v. Terry, 366 F.3d 312, 316 (4th Cir. 2004) (holding Strickland's prejudice prong unsatisfied when defendant asserts only that he "would have denied . . . claim[s] and impeached [witnesses'] credibility, and omits any details that explain why the district court would have given his claims any weight").

In sum, Petitioner's ineffective assistance of counsel claim is without merit.

## IV.    CONCLUSION

For the reasons stated herein, the Court will dismiss the § 2255 petition and grant Respondent's motion for summary judgment.

**IT IS, THEREFORE, ORDERED** that:

1. Petitioner's § 2255 motion to vacate, (Doc. No. 1), is **DENIED** and **DISMISSED**.

2. The Government's Motion for Summary Judgment, (Doc. No. 14), is **GRANTED**.

3. Petitioner's Motion Requesting Default Judgment against the United States, (Doc. No. 12), is **DENIED** as moot.

4. Pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, this Court declines to issue a certificate of appealability as Petitioner has not made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Miller–El v. Cockrell, 537 U.S. 322, 336-38 (2003) (in order to

satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong).

Signed: August 19, 2013

Richard L. Voorhees
United States District Judge